In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00189-CR
_____

DONNA SHELTON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 258th District Court
San Jacinto County, Texas
Trial Cause No. CR12,871

**MEMORANDUM OPINION**

A jury found Donna Shelton[1] ("Donna" or "Appellant") guilty of attack by

dog resulting in serious bodily injury, a third-degree felony. *See* Tex. Health &

Safety Code Ann. § 822.005. The jury assessed Appellant's punishment at ten years'

incarceration in the Department of Criminal Justice but suspended the sentence and

---

[1]The record reflects that Donna Shelton is also known as Donna Leigh
Thompson.

1

placed her on community supervision for ten years, along with a joint restitution to the victim of $20,000. *See id.*; Tex. Penal Code Ann. § 12.34.[2]

In three issues on appeal, Appellant argues that the trial court erred in its jury charge causing her egregious harm, that the trial court improperly commented on the weight of the evidence, and that the evidence is insufficient to support her conviction of attack by a dog. We affirm.

**Background**

**Joshua James**

Officer Joshua James ("Officer James") testified that he is an officer with the Panorama Village Police Department and was previously employed as a deputy with the San Jacinto County Sheriff's Office. On November 28, 2017, he was dispatched to a call on Ridgewood Drive in Shepard. When he arrived, he saw a female lying on the ground with a "blue or grey pit bull circling her." As he approached the woman, the dog continued to circle her and growled at Officer James as the woman was attempting to crawl away. He described the dog as "[v]ery, very aggressive[,]" and he testified he could see the dog's hair standing up, and the dog was snarling and showing his teeth. Officer James testified he had to pull his gun on the dog. Subsequently, EMS arrived, bandaged the woman and took her away to the hospital.

---

[2]Appellant was tried together with her husband, James Shelton, IV, for the same crime. James Shelton was also convicted and filed an appeal with this Court. We address his appeal in Cause Number 09-22-00188-CR.

Officer James identified the owner of the dog as Donna Shelton who lived directly to the left of where the attack occurred. Photographs of the victim's injuries and the scene were admitted.

**Stacy Warren**

Stacy Warren[3] ("Stacy") testified she lives next door to James and Donna Shelton. She stated the Sheltons owned four pit bull dogs in November 2017. According to Stacy, there is a chain link fence separating her property from the Sheltons' property, but in September 2017 during Hurricane Harvey, a tree from the Sheltons' yard fell on the fence. When the tree fell, "it lifted the fence up[,]" allowing the Sheltons' dogs access to Stacy's yard. Stacy testified this allowed the Sheltons' dogs to come into her yard "[m]any" times. According to Stacy, her family had to carry a stick to check their mailbox because "the gray pit, if you turned your back on it, it would come after you." Stacy sent a Facebook message to Donna telling her about the dogs. A screenshot of the message was entered into evidence. This message stated the following, "hun, this is [Stacy] next door. Your dogs are – are loose and in my yard. I don't see any lights on at your place." Stacy testified this message was sent November 21, 2017. According to Stacy, Donna replied and apologized and

---

[3]We refer to the victim and her family members by pseudonyms to protect their privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

said the dogs were digging under the front gate. Stacy testified the Sheltons knew before the dog attack that there was an issue with their dogs getting out of their yard. She recalled another time when the Sheltons' dogs came under the fence and attacked her dogs. Her husband intervened and scared the Sheltons' dogs away. According to Stacy, the dogs were "always coming over" to their yard by crawling under the fence, or just sitting at the back fence "staring at us." Stacy described the Sheltons' attempts to block the dogs access to her yard as "blocks or wood or something like that[,]" but contended "[t]hey were still coming through where they were trying to block." Stacy testified the Sheltons were aware their remedial efforts did not prevent the dogs from coming into her yard. Under cross-examination, Stacy acknowledged that the Sheltons filed an insurance claim to repair the fence after the hurricane and that apart from the Facebook message, she never personally told the Sheltons their dogs were coming into her yard.

The Sheltons' dogs attacked Stacy on November 28, 2017. On that day, Stacy's husband was at work and Stacy was at home with her adult grandson. Stacy testified the Sheltons' oldest dog was the first to come into the yard by coming "underneath the fence in back." When she observed the dog, Stacy put her own dogs in the house and went to take the Sheltons' dog back to their yard. Stacy called the dog by its name and the dog walked next to Stacy's side as she guided the dog up her driveway to go to the Sheltons' house. Stacy denied having anything in her hands

4

or touching the dog. As she was walking with the dog, another one of the Sheltons' dogs came under the fence and "started growling and barking" at Stacy. Then the other two dogs crawled under the fence and began to growl and bark at Stacy. At this point, all four of the Sheltons' dogs were in Stacy's yard. According to Stacy, the "[n]ext thing I know, they're knocking me down on the ground and pulling me into the yard." The attack lasted for 45 minutes with all four dogs attacking Stacy. Stacy's grandson tried to intervene, but the dogs tried to attack him. Stacy was able to call 911 while being attacked. When the officers arrived, one of the dogs was still circling around Stacy.

After the attack, Stacy stayed in the hospital for forty-two days and had multiple surgeries. Stacy testified she had injuries to her scalp, face, ears, shoulders, armpits, back, legs, and feet. Stacy needed multiple skin grafts, staples, stiches, and surgeries to address her injuries. After being released, Stacy has continued to have surgeries, and said she continues to take injections daily. According to Stacy she carries scars on her body from the attack, and the injures to her legs and feet caused permanent damage, including a condition called "drop foot[,]" which permanently affects her gait. Photographs of her injuries were admitted at trial.

**Dane Abshire**

Dane Abshire ("Abshire") testified that he is Stacy's grandson, and at the time of the dog attack he was living with his grandparents in their home. On that day, he

5

was upstairs in their home playing video games when he received a call from his grandmother on her cell phone. He described the call as "really hard to hear[,]…just a bunch of panting[,]" but he "knew something was wrong." Abshire ran downstairs and found his grandmother lying in her front yard. He described the scene as follows,

> By the time I found out where she was, I walked outside, seen the dogs, one of them had a hold of her leg at the time, and she manage to mumble out a couple of words. Something along the lines of: If one of the dogs comes for you, run. Sure enough it did. I ran back inside. I grabbed a firearm just in case one were to come after me, after I was going to go after my Nana. And then, I believe, a deputy pulled up and he took care of the rest. I put everything away and that was it.

Abshire testified the dogs were "pit mixes or pits" that came from the neighbors' house and that before the attack they would sit "in a certain spot of their fence and look at us."

**Doug Warren**

Doug Warren ("Doug") testified that he is Stacy Warren's husband and lives next door to James and Donna Shelton. According to Doug, in 2017 the Sheltons owned four pit bull dogs. Doug testified that there is a five-foot chain-link fence between his property and the Sheltons' property and that in 2017 a hurricane caused a tree to uproot on the Sheltons' property and damage the fence. This damage created an opening in the fence when one of the roots of the tree "picked up one of the post and part of the chain link fence." He testified that before the hurricane and the damaged fence, he could not recall the dogs coming into his yard. Doug stated he

6

was afraid of one of the Sheltons' dogs. Doug recalled that after the hurricane the Sheltons' dogs "were coming over a lot" leading up to the attack on November 28, 2017. He described one incident in which the Sheltons' dogs attacked his dogs after gaining access to his yard by way of the damaged fence. After the dogs attacked his dogs, Doug left a letter on the Sheltons' front gate telling them about the attack. He recalled that after the Sheltons' dogs attacked his dogs, the Sheltons' dogs continued to get into his yard "so many times" through the hole in the fence. Doug testified that he verbally notified the Sheltons and they knew there was a problem. He was told the Sheltons were waiting to "settle[] with the insurance company… to repair the fence."

On November 28, 2017, Doug received a phone call from his grandson that his wife was attacked by the dogs and had gone to the hospital. He testified that his wife remained in the hospital for forty-two days and that Stacy now has a permanent disability due to the attack. Photographs of her injures in the hospital were admitted at trial.

**Beth Thomas**

Beth Thomas ("Thomas") is Stacy's mother. Thomas testified that before her daughter was attacked by the dogs, Thomas would stay at Stacy's and Doug's home while they were on vacation. According to Thomas, she would have to "carry a big stick to the mailbox" because one or two of the Sheltons' dogs would come and bark

7

at her. Although the dogs never tried to attack her, she said the dog or dogs did "scare" her. Thomas testified the Sheltons' dogs had access to her daughter's yard through the fence which was damaged by a tree that fell during a hurricane. Thomas said the dogs crawling under the fence would "[n]ot happen all the time[,] but several times." Thomas denied ever seeing anything in place to prevent the dogs getting access to her daughter's yard.

**Michael Jenkins**

Michael Jenkins ("Jenkins") is a neighbor of both the Sheltons and the Warrens. He testified that "several days prior" to Stacy's attack, his wife was walking their dog when he received a phone call from her. She was "very upset" and asked him to come get her. When Jenkins arrived at his wife's location, she was across the street from the Sheltons' home. He testified there was a large crowd of several neighbors gathered around his wife who said that the Sheltons' dogs had left their yard and were coming "after our dog and she got tangled in the leash and fell." Jenkins testified the dogs belonged to James who Jenkins described as "very apologetic." James told Jenkins "[I]f you want me to, I'll put my dogs down[,]" but Jenkins told him "no." James did not say how the dogs got out of his yard.

**Derrick McEntire**

Derrick McEntire ("McEntire") testified that from 2017 to 2019 he was employed as an animal control deputy for the San Jacinto County Sheriff's

Department. McEntire conducted a follow up investigation after the dog attack on November 28, 2017, which included visiting the location of the attack, taking pictures, and making a report. He observed blood on the ground and a pair of flip flops in the area where the attack occurred. He also observed damage to the fence separating the Sheltons' and the Warrens' properties, and "a makeshift or temporary repair of the fence," using bricks and logs in an attempt to block the holes. McEntire did not know who put the items in the fence or how long they had been there. McEntire spoke to James at his residence, and James told him to euthanize his animals because he did not want them back. McEntire testified that James told him "he knew about the tree being down which caused the fence to be insufficient to hold his dogs in[,]" and that they had made a claim on his homeowner's insurance. McEntire agreed that whoever attempted the makeshift repair "didn't do a very good job[.]" Photographs from McEntire's investigation were admitted into evidence.

**Donna Shelton**

Donna Shelton confirmed she is married to James, and they live next door to the Warrens.[4] She denied ever having any issue with aggressiveness on the part of her dogs before they attacked Stacy. Donna testified that after the hurricane uprooted their tree and caused damage to their fence, they made a claim on their homeowner's insurance. She described the Sheltons' efforts to repair the fence as follows:

---

[4]James Shelton did not testify at trial.

9

My husband had taken some metal stakes to try and pull the fence down. That wasn't working. He had stuck a brick to keep them from going under and that wasn't working. So he had taken some of the stump that he had cut and put it to kind of cover the fence and we noticed that one of the dogs had pushed the stump under the fence. So we just kept putting more stumps there to try and keep them from being able to go under it.

According to Donna, anytime her husband would see something wrong with the fence, he would try to rectify the problem. But Donna acknowledged, "the dogs were just as adequate getting out as [James] was at stopping them." She confirmed that she had received the Facebook message from Stacy but denied ever receiving a letter on her front gate. Donna testified that she did not know the neighbors were afraid of her dogs and if she had known the dogs were going onto their property or were a danger, she "would have put them all down[,]" because they have children [and] "can't risk that." Other than the message from Stacy, she denied being aware that her dogs were getting out of her yard.

On November 28, 2017, Donna was returning from work and turned into her subdivision behind an ambulance. She noticed the ambulance turn into her neighbors' driveway and saw her neighbor lying on the ground. She pulled into her driveway and put her dogs in the house, but later learned her dogs were the reason for the ambulance. The dogs were then taken to a secure location and later euthanized.

At the conclusion of trial, a jury found James and Donna guilty of attack by dog resulting in serious bodily injury. After testimony during the punishment phase of their trial, James and Donna were each sentenced to ten years' incarceration in the Texas Department of Criminal Justice, with the sentence probated and both placed on community supervision for ten years. Donna timely filed this appeal.

**Sufficiency of the Evidence**

In her third issue, Appellant challenges the sufficiency of the evidence arguing "the evidence is insufficient to show Appellant (1) failed to 'secure' her dog and (2) ought to be aware of the risk her dog would attack a person without provocation." Because this issue would offer Appellant her greatest relief on appeal, we address it first.

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

11

When examining whether a criminal conviction is supported by sufficient evidence, we compare the evidence to the elements of the offense as defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761-62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

As applicable here, the owner of a dog commits the offense of attack by dog if the owner,

with criminal negligence, as defined by Section 6.03, Penal Code, fails to secure the dog and the dog makes an unprovoked attack on another person that occurs at a location other than the owner's real property or in or on the owner's motor vehicle or boat and that causes serious bodily injury, as defined by Section 1.07, Penal Code, or death to the other person.

*See* Tex. Health & Safety Code Ann. § 822.005 (a)(1).

Texas Penal Code section 6.03 defines "criminal negligence" as

[a] person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(d).

Texas Health and Safety Code section 822.001(4) defines "secure" as follows: "'Secure' means to take steps that a reasonable person would take to ensure a dog remains on the owner's property, including confining the dog in an enclosure that is capable of preventing the escape or release of the dog." Tex. Health & Safety Code Ann. § 822.001(4). Further, "serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ[.]" Tex. Penal Code Ann. § 1.07.

13

The State alleged the following in the indictment.

> JAMES JEFFERSON SHELTON, IV hereafter styled Defendant, on or about the 28th day of November, 2017, and before the presentment of this indictment, in the County and State aforesaid, did then and there, by criminal negligence, failed to secure a dog that defendant owned, and the dog made an unprovoked attack on another person, to-wit: [Stacy Warren], causing serious bodily injury, and the said unprovoked attack occurred at a location other than the real property of the defendant.

*See* Tex. Health & Safety Code Ann. § 822.005.

The evidence admitted at trial established the following: (1) the Sheltons owned four pit bull, or pit bull mix, dogs in 2017; (2) a hurricane damaged the fence between the Warrens' and the Sheltons' properties; (3) the Sheltons knew that their dogs could and would escape their yard; (4) the dogs had attacked other dogs in the neighborhood after escaping the Sheltons' yard; (5) the Sheltons had attempted to close the hole with stakes, bricks and stumps; (6) Donna admitted that the dogs continued to escape with each remedial effort; (7) Donna told Stacy that the dogs escaped through the front gate; (8) James offered to euthanize the dogs when the Jenkins' dog was attacked; (9) the animal officer testified the attempts to fix the hole in the fence were inadequate; and (10) the dogs attacked Stacy in her yard and caused her serious bodily injuries including permanent disfigurement.

On appeal, Appellant asserts she took steps a "reasonable person" would take to secure their dogs, and that she did not know that her dogs could attack unprovoked. While Appellant argues Stacy was "neither scared or uncomfortable"

14

when guiding her dog back to her yard, the State was not required to prove Stacy was afraid because Stacy's state of mind is not an essential element of the offense. *See id*. § 822.005(a). What the State was required to demonstrate was that Appellant was criminally negligent in failing to secure each of her dogs, and that one of the dogs attacked Stacy, unprovoked and outside of Appellant's yard, causing serious bodily injury or death. *Id.*

The "'combined and cumulative force of all the incriminating circumstances'" point to Appellant's guilt, and circumstantial evidence alone may be sufficient to uphold a conviction. *See Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)); *see also Ramsey v. State*, 473 S.W.3d 805, 808-09 (Tex. Crim. App. 2015). From the evidence admitted, and based on rational inferences which could be drawn from that evidence, a jury could have reasonably concluded that Appellant failed to secure each of her dogs when she ought to have been aware of a substantial and unjustifiable risk that one of her dogs would escape her property through the damaged fence and engage in an unprovoked attack on another person, causing serious bodily injury.[5]

---

[5]Although the court's charge did not define "secure," we measure the evidence by the elements of the offense under a hypothetically correct charge and conclude that the evidence was sufficient to enable a jury to reasonably conclude that Appellant failed to take steps that a reasonable person would have taken to ensure that her dogs remained on her property, including confining the dogs in an enclosure capable of preventing the escape or release of the dogs. *See Malik*, 953 S.W.2d at 240.

*See* Tex. Health & Safety Code Ann. §§ 822.005(a), 822.001(4); Tex. Penal Code Ann. § 6.03(d). A jury also could have reasonably concluded the risk was such that Appellant's failure to perceive it constituted "a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from [Appellant's] standpoint." Tex. Penal Code Ann. § 6.03(d). Thus, the evidence was legally sufficient. *See Jackson*, 443 U.S. at 318-19; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13. We overrule Appellant's third issue.

## Charge Error

In her first issue Appellant argues that the trial court erred by not including the "statutory definition of 'secure'" in its charge. The trial court is required to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *see also Mendez v. State*, 545 S.W.3d 548, 551-52 (Tex. Crim. App. 2018); *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995).

"Appellate review of purported error in a jury charge involves a two-step process. First, we determine whether the jury instruction is erroneous. Second, if

16

error occurred, then an appellate court must analyze that error for harm." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003) and *Abdnor*, 871 S.W.2d at 731).

Here, the State concedes that it was error for the trial court not to include the definition of "secure" in its charge, so we must proceed to the second step and determine whether Appellant was harmed. Because Appellant did not object to the charge, the conviction may be reversed only if the error amounts to fundamental error, which requires Appellant to demonstrate the error resulted in "egregious harm." *See* Tex. R. App. P. 33.1(a); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

"Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (quoting *Reeves v. State*, 420 S.W.2d 812, 816 (Tex. Crim. App. 2013)); *see Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) ("[Egregious harm] is a difficult standard to meet and requires a showing that the defendants were deprived of a fair and impartial trial."). An error results in egregious harm only if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *See Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). The harm must be actual, not merely theoretical. *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986). When analyzing

whether charge error results in egregious harm, we must examine "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

*The Entire Jury Charge*

First, we examine the entirety of the jury charge. The relevant portions of the jury charge in this case included the following instructions and definitions:

**Relevant Statutes**

A person commits an offense if, by criminal negligence, they *fail to secure* a dog that person owned and the dog made an unprovoked attack on another person, causing serious bodily injury to the other person, and said unprovoked attack occurred at a location other than the real property of the dog owner.

**Definitions**

"Serious Bodily injury" means: bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

A person acts with criminal negligence or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

…

18

**Application of Law to Facts**

Now, if you find from the evidence beyond a reasonable doubt that on or about the 28TH day of November, 2017, in San Jacinto County, Texas, the defendant, JAMES JEFFERSON SHELTON, IV, did then and there by criminal negligence, *fail to secure* a dog that defendant owned and the dog made an unprovoked attack on another person, to-wit: [Stacy Warren] causing serious bodily injury to [Stacy Warren], and said unprovoked attack occurred at a location other than the real property of the defendant, then you will find the defendant guilty of the offense of attack by dog, as charged in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of attack by dog. (Emphasis added).

The purposes of the charge are to inform the jury of the law and to guide the jury in applying that law to the facts of the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). Definitions are included in the charge "to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Caldwell v. State*, 971 S.W.2d 663, 666 (Tex. App.—Dallas 1998, pet. ref'd). "[F]ailure to give an abstract instruction is reversible only when such an instruction is necessary to a correct or complete understanding of concepts or terms in the application part of the charge." *Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim. App. 1996), *overruled on other grounds by Malik*, 953 S.W.2d 234. The purpose of the application paragraph is to "appl[y] the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment

19

allegations." *Vasquez*, 389 S.W.3d at 366. "[T]he application paragraph must (1) specify 'all of the conditions to be met before a conviction under such theory is authorized[;]' (2) authorize 'a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers[;]' or (3) 'contain[] some logically consistent combination of such paragraphs.'" *Vasquez*, 389 S.W.3d at 367 (quoting *Plata*, 926 S.W.2d at 304).

The Court of Criminal Appeals has explained, "Failure to secure a dog is the conduct prohibited by the statute, and the key word in the statute, 'Secure,' is defined." *Watson v. State*, 369 S.W.3d 865, 871 (Tex. Crim. App. 2012). Section 822.001(4) defines "secure" such that it means "to take steps that a reasonable person would take to ensure a dog remains on the owner's property, including confining the dog in an enclosure that is capable of preventing the escape or release of the dog." Tex. Health & Safety Code Ann. § 822.001(4). The definition of "secure" under section 822.001 employs an objective, reasonable person standard. *Watson*, 369 S.W.3d at 871.

When a statutory definition is omitted from the charge, we assume the jury gave the term its commonly understood meaning. *Olveda v. State*, 650 S.W.2d 408, 409 (Tex. Crim. App. 1983). Appellant asserts the commonly understood meaning of "secure" in this context is "to relieve from exposure to danger, act to make safe against adverse contingencies, to bring about, effect, to make fast." *See Merriam-*

20

*Webster.com* https://www.merriam-webster.com/dictionary/secure (October 28, 2024). According to Appellant, "The common definition of 'secure' imposes a strict-liability burden on defendants rather than an evaluation of actions taken by a reasonable person to ensure the dogs remained on the property." We understand Appellant to argue the common meaning of the phrase "fail to secure" lowered the State's burden. In response, the State argues Appellant was not harmed because the application paragraph instructed the jury that in order to convict Appellant the jury was required to find beyond reasonable doubt that "by criminal negligence, [Appellant] fail[ed] to secure a dog[.]" We understand the State to argue that the juxtaposition of the phrases "criminal negligence" and "fail to secure," combined with the definition of "criminal negligence" actually increased the State's burden by requiring the State to prove Appellant "gross[ly] deviat[ed] from the standard of care that an ordinary person would exercise" rather than merely that she failed "to take steps that a reasonable person would take."

Appellant's and the State's arguments both focus on the "reasonable person" language of the statutory definition of "secure," but both fail to address the remainder of the language in the definition. In order to "secure" a dog according to the statutory definition, an owner must "take steps that a reasonable person would take to *ensure* a dog remains on the owner's property, including *confining* the dog

21

in an enclosure that is *capable* of *preventing* the escape or release of the dog." Tex. Health & Safety Code Ann. § 822.001(4) (emphasis added).

If the court had provided the statutory definition of "secure" in the charge, the jury would have been asked to decide whether the State proved beyond a reasonable doubt that Appellant "by criminal negligence" failed "to take steps that a reasonable person would take to ensure a dog remains on the owner's property, including confining the dog in an enclosure that is capable of preventing the escape or release of the dog." *Id.* Instead, assuming the jury used the commonly understood meaning of "secure," the jury was asked to decide whether the State proved beyond a reasonable doubt that Appellant "by criminal negligence" failed "to relieve from exposure to danger, act to make safe against adverse contingencies, to bring about, effect, to make fast." *See Merriam-Webster.com* https://www.merriam-webster.com/dictionary/secure (October 28, 2024).

Either way, the State was required to prove Appellant's efforts to keep the dogs on the property were not only ineffective but were also accompanied by a gross deviation from the standard of care that would have been used by an ordinary person. Therefore, we conclude the State's burden was substantially the same with or without the statutory definition of "secure." The charge, when viewed in its entirety, weighs against a finding of egregious harm.

*The State of The Evidence*

Next, we examine the evidence presented at trial. Although the record includes evidence James used metal stakes, bricks and tree stumps in an attempt to block the hole in the fence, there is no evidence any of such efforts ever actually worked. To the contrary, Donna testified these steps did not work, and the dogs continued to get out. On cross-examination Donna testified:

Q.     Okay. And the only testimony you have about the fence is that your husband had put something up there, according to your knowledge, and if she got attacked on her own property whatever he put up was not adequate to keep them off, right?

A.     I feel like the dogs were just as adequate at getting out as he was at stopping them.

Q.     Okay. But my question is: If the dogs got through the fence that day -- as you heard the testimony – whatever there was not adequate to keep them in your yard; would that be correct?

A.      I suppose so.

Appellant's argument on appeal is that the charge should have included the statutory definition of "secure" so the jury could evaluate whether the steps taken by James were steps that a "reasonable person" would have taken. Again, this argument ignores the remainder of the statutory definition which indicates such steps "includ[e] confining the dog in an enclosure that is capable of preventing the escape or release of the dog." Tex. Health & Safety Code Ann. § 822.001(4). Whatever may be said of James's repair efforts, the record is devoid of any evidence the fence was

23

ever capable of preventing the dogs from escaping at any time after the hurricane up to the time they attacked Stacy Warren two months later. In the absence of evidence Appellant complied with the statutory definition of "secure," any harm resulting from the omission of that definition was merely theoretical. *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005) ("Under the *Almanza* standard, the record must show that a defendant has suffered actual, rather than merely theoretical, harm from jury instruction error."). The evidence, viewed in its entirety, weighs against a finding of egregious harm.

*The Arguments of Counsel*

Our review now turns to the parties' arguments at trial. During closing argument, both attorneys discussed criminal negligence in general terms, primarily in the context of whether Appellant was or should have been aware of a significant and unjustifiable risk that the dogs might maul someone. The State never argued the criminal negligence standard applied solely to the question of Appellant's perception of the risk. Nor did the State argue the jury should apply a strict liability standard and find Appellant guilty based solely on the fact the dogs escaped and attacked Stacy Warren. Rather, the State acknowledged the criminal negligence standard applied in evaluating Appellant's actions: "It's important to note that the allegation here is criminal negligence. What the defendants *did or did not do* that caused the – the injury that occurred to Mrs. Warren." (Emphasis added). This argument

24

reinforced the charge's application paragraph which instructed the jury to find whether "by criminal negligence, [Appellant] fail[ed] to secure a dog[.]" Accordingly, we conclude this factor weighs against a finding of egregious harm.

*Other Relevant Information*

Finally, we consider any other relevant information revealed by the record. During voir dire, the State explained section 822.005(a) to the venire members, and inquired about examples in which a person would "fail to secure" their dog. One panel member stated, "Letting them run loose." Another offered, "I was just going to say one case is if they knowingly have them in a cage or a pen and they know that it's not always secure, that they've been able to get out and escape in the past." Another panel member said, "Not having a good enough fence to keep the animal in." The State then asked, "Would it matter to you if the people that owned the dogs had *received notice* about issues of that? Would that be an important thing for you to consider?" to which the panel responded, "Yes." (Emphasis added). These questions and answers tend to contradict Appellant's argument on appeal that the jury applied a strict liability standard, rather than the "criminal negligence" standard included and defined in the charge. We conclude this factor weighs against a finding of egregious harm.

After reviewing the record, including the entire charge, the state of the evidence, the arguments of counsel and other relevant information, we conclude the

25

error in the charge did not result in egregious harm because it did not affect the basis of the case, it did not deprive Appellant of a valuable right or vitally affect a defensive theory, and Appellant was not deprived of a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. We overrule Appellant's first issue.

**Trial Court's Response to Jury Question**

In her second issue, Appellant complains about the trial court's response to a question from the jury while it was deliberating on Appellant's guilt or innocence. Upon receiving the question, the trial court had the following on-the-record discussion with counsel:

> MR. ETHERIDGE: What's that say?
>
> MR. TRAPP: Regardless of the outcome, can we request –
>
> THE COURT: Leniency.
>
> MR. TRAPP: Oh, leniency. I don't know that you could answer that. I mean, you could certainly tell them that the -- answer however you want to, Judge. You can answer they're both eligible for probation as far as I know. If they're asking about what can happen. I don't have a problem with that. I don't know what –
>
> THE COURT: Either of them have a felony conviction?
>
> MR. ETHERIDGE: No.
>
> THE COURT: A pre-sentence investigation will be conducted if the defendants are found guilty and both are eligible for probation.
>
> MR. TRAPP: And both?

26

THE COURT: Are eligible for probation.

MR. TRAPP: Okay. I'm good with that. Are you good with that Mr. Etheridge?

MR. ETHERIDGE: Yeah.

MR. TRAPP: Okay.

Although Appellant did not object to the trial court's response to the jury's question regarding leniency, Appellant argues on appeal that it constituted a comment on the weight of the evidence in violation of Texas Code of Criminal Procedure article 38.05 and was reasonably calculated to prejudice Appellant's right to a jury trial. *See* Tex. Code Crim. Proc. Ann. art. 38.05 (prohibiting trial judges from making "any remark calculated to convey to the jury his opinion of the case."). Appellant also argues the trial court's response to the jury's question violated the instruction in the charge that the jury should restrict its deliberations to deciding whether Appellant had been proven guilty. In response, the State argues Appellant waived any error by failing to object. As a general rule, in order to preserve a complaint for appellate review, the record must show the complaining party made a timely objection stating the grounds with sufficient specificity to inform the trial court of the complaint unless the grounds are apparent from context. Tex. R. App. P. 33.1.

"When the trial judge responds substantively to a jury question during deliberations, that communication essentially amounts to an additional or supplemental jury instruction." *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993). Although *Almanza* generally permits a defendant to object for the first time on appeal to charge error that results in egregious harm, the Court of Criminal Appeals has held that when the defendant's trial counsel agrees to the trial court's response to a jury question, any error is waived, *Almanza* does not apply, and the defendant may not raise an objection for the first time on appeal. *Green v. State*, 912 S.W.2d 189, 193 (Tex. Crim. App. 1995) (presuming from a silent record that appellant's trial counsel agreed to the trial court's proposed response to the jury's question). *See also Word v. State*, 206 S.W.3d 646, 652 (Tex. Crim. App. 2006) (finding "appellant procedurally defaulted… any objection to the trial court's answers to the jury questions" where the record "did not show that the trial court failed to notify appellant of the jury questions or that appellant objected to the trial court's answers to the jury questions").

Here, the record affirmatively shows Appellant's trial counsel was present when the trial court formulated its proposed response to the jury's question, did not object, and voiced agreement with the language of the response. Therefore, with respect to Appellant's complaint that the trial court's response violated the charge's instruction that the jury restrict its deliberations to deciding whether Appellant had

28

been proven guilty, we conclude nothing is presented for our review, because Appellant waived any such error, and *Almanza* does not require us to determine whether the trial court's response was erroneous and caused egregious harm. *Green*, 912 S.W.2d at 193.

However, with respect to Appellant's complaint that the trial court's response constituted a comment on the weight of the evidence in violation of article 38.05, our analysis does not end there because the Court of Criminal Appeals has held that such challenges are not forfeited by trial counsel's inaction and may be raised for the first time on appeal. *Proenza v. State*, 541 S.W.3d 786, 801 (Tex. Crim. App. 2017) ("the right to be tried in a proceeding devoid of improper judicial commentary is at least a category-two, waiver-only right"). *See also Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993). Therefore, we must determine whether the instruction constituted a comment on the weight of the evidence as Appellant claims on appeal.

The Court of Criminal Appeals has interpreted article 38.05 "to forbid any discussion by the trial judge in the jury's presence of evidence adduced at trial which might suggest to the jury the judge's personal estimation of the strength or credibility of such evidence or which might tend to emphasize such evidence by repetition or recapitulation." *Atkinson v. State*, 923 S.W.2d 21, 24 (Tex. Crim. App. 1996) (collecting cases). The trial court's response to the jury's question in this case does not do so. It does not "obliquely or indirectly convey some opinion on the weight of

29

the evidence." *Brown v. State*, 122 S.W.3d 794, 801 (Tex. Crim. App. 2003). It does not "focus[] the jury's attention on a specific type of evidence that may support an element of an offense or a defense," nor does it "improperly tell[] the jury how to consider certain evidence before it." *Walters v. State*, 247 S.W.3d 204, 214 (Tex. Crim. App. 2007).

We conclude the trial court's response does not constitute a comment on the weight of the evidence in violation of article 38.05. That said, even if it were a comment on the weight of the evidence, we must disregard the error if it does not affect Appellant's substantial rights. Tex. R. App. P. 44.2(b). *See Proenza*, 541 S.W.3d at 801 (non-constitutional harm analysis under Rule 44.2(b) applies to article 38.05 violations). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). "On the other hand, if 'the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.'" *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (citing *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)). In evaluating the likely effect of the trial court's response regarding presentence investigative reports and the possibility of probation, we note that during voir dire, the jury panel had already received instructions from the trial court regarding presentence investigative reports,

and had already heard the State's trial counsel provide the following explanation of

the range of sentences available, including the possibility of probation:

> As Judge Kitchens told you earlier, trials -- criminal cases are bifurcated.[6] It means there's two phases: first is the guilt/innocence phase where the jury determines whether or not the person charged with the offense is guilty of the offense for which they stand charged. If they're found not guilty, the trial is over at that point in time. If they're found guilty, then there's two things that can happen: Before a trial, a person accused of a crime can file an election of punishment. That means that they can choose that in the event that I'm found guilty, I can let the judge determine my punishment. If they don't file that election then it's up to the jury to arrive at that punishment to determine what a proper punishment is.
>
> Now, here in the state of Texas, this is a third degree felony. On the low end there's 2 years in prison; on the high end there's 10 years in prison. Now, my office does not send people to prison, it takes either a judge sentencing them to prison or a jury having convicted them determine that they need to go to prison for what they have done. If it's shown that they have never before been convicted of a crime in this -- of a felony offense in this state or some other state, then a citizen convicted of a crime is eligible for probation. The minimum of 2 years in probation -- 2 years of probation up to 10 years on probation; there can be a fine assessed up to $10,000.00; there can be community service assessed; there can be restitution assessed if that's called for; there can be any type of rehabilitation program that the Court determines.
>
> As Judge Kitchens told you, that he standardly orders what's called a 'presentence investigative report.'[7] Now, I want to make sure that if you are selected on this jury, that because the judge is going to be the potential one that would assess punishment, is that going to affect your ability on this case to be a fair and impartial juror in determining whether or not either of these two people committed this offense that

---

[6]The trial court's comments to the jury panel regarding bifurcation are not included in the record.

[7]The trial court's comments regarding presentence investigative reports are not included in the record.

they stand charged? Do you trust this Court enough that they're going to make -- if they're found guilty – he's going to make an informed decision as to a proper punishment? Everybody okay with that? Anybody not okay with it? If you're not okay with it, let me know, because sometimes that affects people. They want to make sure that – they may have a preconceived notion of what justice is in a particular case and then they may get to the point, well, you know, I don't know if the judge is going to do -- if they're found guilty or think they're guilty -- but I don't think the judge may do what I want to see done in this case. So I want to make sure that you are trusting enough in the system, trusting enough in the judgment of the people involved in this that you're going to be okay -- if they're found guilty -- with whatever type of punishment that the judge may assess in this case based upon a presentence investigative report. Anybody have an issue with that? If so, raise your hand. Okay. This is going to be one of the quicker voir dires you've seen of my office. I appreciate your time and attention.

We also note that the court's charge included the instruction, "Your sole duty at this point is to determine whether the defendant has been proved guilty. You must restrict your deliberations to this matter." We "assume that the jury would follow the instruction as given, and we will not reverse in the absence of evidence that the jury was actually confused by the charge." *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). We conclude any error in the trial court's response to the jury's question was harmless because the record does not indicate that it had a substantial and injurious effect on the jury's verdict. *King*, 953 S.W.2d at 271. We overrule Appellant's second issue.

## Conclusion

Having overruled all of Appellant's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on July 22, 2024
Opinion Delivered November 13, 2024
Do Not Publish

Before Johnson, Wright and Chambers, JJ.